JOHN DANAHER, AS ADMINISTRATOR, ETC., OF THE ESTATE OF THOMAS P. DANAHER, DECEASED, APPELLANT, *v.* THE CITY OF BROOKLYN, RESPONDENT.

*Negligence of a city in maintaining a well containing impure water caused by the properties contained in the earth through which the water percolates — the city is not liable until notice — duty of the board of health to examine the water and notify the city — adjudications of the board of health not competent to charge the city until brought to its attention — effect of the subsequent act of the city abating the nuisance.*

Upon an appeal from a judgment dismissing the plaintiff's complaint, it appeared that the action was brought to recover damages against the city of Brooklyn for causing the death of the plaintiff's intestate by negligently maintaining a well and pump for drinking purposes, and furnishing impure, poisonous and unwholesome drinking water to the deceased, by the drinking of which he was killed.

No proof was offered to show that the well had become fouled by anything which had gone into it directly from the surface of the ground, or through anything injected into it through imperfections in any of the sewers or street arrangements, or from any special deposit of filth upon the surface in its immediate vicinity; or that the city, or any of its officers, did or suffered any act which polluted the water from rains falling upon the surface, and percolating from the surface into the well, or that they in any way impeded or clogged, or otherwise subjected to influences which would pollute, the water so percolating from the surface into it.

*Held,* that, as it was apparent that the impurities in the water must have come from the properties of the earth through which the percolation of the water occurred, which were taken up during the process, the cause of the impurity of this water fell within the range of the powers lodged in the city department, whose duty it was to care for the public health.

That the sickness and death here complained of, assuming that they were traceable to the water of the well, were attributable to the failure of the health department to watch over the influences which might affect the water, or to examine it or to take, or call upon the city to take, measures to prevent the public from using the well.

That the duty of watching over the qualities of this water, as it was affected by the natural sources of this well, was not imposed upon the city of Brooklyn until the health department of the city gave notice to it of the impurity, or until it acquired knowledge of the fact in some other way.

That a clear distinction existed between the duties of the health department and the city itself in respect to the cause which led to the death of the deceased.

That the former was bound to exercise reasonable diligence over the influences which might affect this water, as connected with the method by which it was collected, while the latter was bound to keep its sewers and streets in such condition that the water would not be polluted, and to keep the wells and pumps in proper repair.

That adjudications, made by the department of health respecting the natural quality of this water, were not material or competent evidence to charge the city with any active duty respecting it until they were brought to its attention; nor was the fact that the city subsequently acted on the theory that this water was unwholesome of any importance.

The cases relating to the liability of the city, arising in the discharge of the duties imposed upon it by its charter, collated and considered by PRATT, J.

APPEAL from a judgment of the Kings County Circuit Court on June 16, 1887, dismissing the plaintiff's complaint, entered in the office of the clerk of Kings county on the same day.

The action was brought against the city of Brooklyn to recover damages for causing the death of the plaintiff's intestate by negligently maintaining public wells and pumps for drinking purposes, and furnishing impure, poisonous and unwholesome water, by the drinking of which he was killed.

*Franklin M. Danaher* and *Roger A. Pryor*, for the appellant.

*Almet F. Jenks*, for the respondent.

PRATT, J.:

We have failed to find anything in the evidence which was received, or that offered, if it had been admitted, which would justify a finding of negligence in this case against the city.

Before applying the legal principles which seem to us to govern the case, let us endeavor to get a clear view of the facts upon which the plaintiff's theory is founded. It is alleged, in substance, that plaintiff's intestate became sick and died because he had been drinking water from one of the public wells which the city had established in one of its streets, and in which it had placed a pump for public use. The theory of the action is that the city authorities, in that way, invited the public to partake of the water, and that the city, for that reason, was bound to be vigilant and take notice of the quality and properties of the water, and, in fact, assure its wholesomeness, so long as it maintained the pump, and was bound to abate it as a nuisance so soon as it, the water, became unfit for use. We do not understand that any proof was offered tending to show that the well had become foul from anything which had gone into it directly from the surface, or through anything injected into it through imperfections in any of the sewers or street arrangements, or from any special deposit of filth upon the surface in its immediate vicinity; but solely from the general fact that it was an ordinary well, sunk and stoned up in the ordinary way into earth, the surface of which was used as it is ordinarily used in large cities. In other words, it was assumed, if not proven, that this well was supplied as wells are ordinarily supplied with water, viz., from rain-falls through percolation from the surface until it reaches some impermeable stratum, and thence into the shaft which is sunk therein; and that the impurities came from properties of the earth through which this percolation occurred, which were taken up during this natural process. There is no pretense that the city, or any of its officers, did or suffered any act which polluted these waters, or that they constructed or, in any respect, mismanaged any part of the street so that this natural process was, in any respect, impeded or clogged or otherwise subjected to influences which would pollute the percolating water. It is thus apparent that the cause of the impurity of this water fell within the range of the powers lodged in the city department, whose duty it is to care for the public health. For aught that appears, the impurities may have been attributable to privy vaults or discharge of refuse upon the lands of private owners, or the accumulation of stagnant surface-water upon remote vacant lots, which, descending by natural laws, found their way into this

excavation. Hence it is tolerably plain that the impurity of the water was not the result of the use of the street as a street, but either to the want of foresight in adopting a plan in this system of supplying water; or to the lack of vigilance in those whose duty it was to watch over the influences which would affect the quality of the water thus collected. The fixing of this liability involves a statement of a few of the general principles relating to the powers and duties of municipal corporations.

Turning, then, to the duties of the city, it may be observed that its functions are of two classes, those of a purely public and political character as the representative of the State, and those of a private nature. Generally speaking, it is only for its exercise or neglect of the latter class of powers that it becomes liable in damages. But unlike the involuntary and *quasi* corporations, composed of the counties and towns of the State, it undoubtedly assumes certain powers, and is bound to discharge certain duties which they are not bound to perform. For example, the latter are bound to take care of the public highways; but, in the absence of statutory liability, they are not liable for injuries to individuals from neglect to exercise these powers. The duty of keeping public roads safe for ordinary use rests upon the officers, when the money or other means for that purpose are in their hands; and if they are without such means, then, generally speaking, the injured person is without redress. It is not so with municipal corporations; they exist by their own choice, and not as a necessary part of the fundamental political divisions of the State. By the solicitation and acceptance of their charters they, without express statutory liability, assume and are bound to the reasonable exercise of their chartered powers, because their existence is voluntary, and, in the nature of things, they have procured special powers which are not necessary to the general system of the State, such as the right to establish streets with their sidewalks, and the peculiarities which distinguish them from the ordinary country roads, sewers, etc. But it is not for injuries resulting from every exercise or omission to exercise these special and peculiar powers that the municipal corporation becomes liable to the person injured. The State makes use of the municipalities as the means by which to exercise its own governmental functions within the territory which would otherwise be under the

control of its counties or towns. So, too, they are invested with certain judicial or legislative powers to determine when and by what means they will establish their own local improvements. They may act or omit to act within the whole range of power which is judicial in its nature and character, generally speaking, without liability. They may, in the exercise of purely judicial functions, determine when and where a street shall be opened or a sewer shall be constructed, and for that exercise of power or omission to exercise it no liability arises. So, too, it may be generally stated that they are not liable for defects in the plan of construction as distinguished from the method and manner of its execution.

Perhaps this statement requires some qualification when applied to peculiar cases (*Gould* v. *City of Topeka*, 32 Kans. 485 ; 49 Am. Rep., 496 ; *City of Evansville* v. *Decker*, 84 Ind., 325 ; 43 Am Rep., 86), but it is believed to be true as a general rule. (*Urquhart* v. *City of Ogdensburg*, 91 N. Y., 67.) For example, they are not liable for errors of judgment in determining the grade of a street nor in the capacity of a sewer, but they are liable if they do not execute their plan with care and skill or fail in reasonable vigilance in the use of it or in keeping it in repair, and in special cases for the results of such use where a trespass is thereby committed upon another. It may well be doubted if they may, with impunity, adopt a plan, the natural, obvious and direct result of which would be to create a nuisance (*City of Evansville* v. *Decker*), or where the use of the sewer substantially appropriates private property to public uses without compensation. (*Seifert* v. *The City of Brooklyn*, 101 N. Y., 137.) But that can scarcely be applied to the present case. No such result would follow from the execution of the plan to construct a well, unless under special and peculiar circumstances which do not apply to the construction and use of this well. The same general rule applies to their duties respecting streets and public places, and even for the uses which it suffers individuals to make thereof. To this class of liabilities belong all structures or contrivances which overhang or underlie a street or sidewalk such as signs or vaults and the like, as well as those which are made upon the surface, such as coal-holes, area-ways, etc. The ground of this liability is that such contrivances interfere with

the street itself, which they are bound in their private capacity to maintain in a reasonably safe condition for public use.

In all these cases the municipality is liable without any express statutory imposition of duty. The general rule deducible from this class of powers seems to be that while the city incurs no liability for its omission to exercise its judicial and legislative functions, it, nevertheless, becomes liable for neglect in the reasonable management of the institutions which it determines to establish, so soon as it enters upon the establishment thereof. But there is a different class of powers exercised by municipal corporations which impose no liability unless by express provision of statute. These may be classed as governmental powers, that is to say, they are peculiar to and do not fall within the limitations which distinguish them from the *quasi* corporations to which we have alluded. To this class belong the injuries resulting to persons and property by their failure to afford protection against the violence of mobs, the acts of policemen, firemen, etc. And the simple fact that it has the power to appoint, and of taxation to compensate its appointees, does not create a liability.

In these respects it acts as the agent of the State and exercises a purely governmental power. The officers thus created are public officers engaged in the discharge of public as distinguished from the special and peculiar functions which distinguish municipal corporations from the other political divisions of *quasi* corporations of the State. While these rules are well established, a few illustrative cases may be of service in Leading up to the consideration of the particular cause of the injury of which plaintiff complains. A county is not liable for the acts or negligence of officers or employees which it appoints in the erection or management of a court-house (*Hollenbeck* v. *Winnebago Co.*, 95 Ill., 148 ; 35 Am. Rep., 151) ; nor for injuries sustained by the defective construction or imperfect lighting thereof (*Kincaid* v. *Hardin Co.*, 53 Iowa, 430 ; 36 Am. Rep., 236); nor is a city liable for the acts or neglect of its board of education (*Ham* v. *The Mayor, etc.*, 70 N. Y., 459) ; nor for those of the board of charities, etc. (*Maxmilian* v. *The Mayor, etc.*, 62 id., 160) ; nor for those of an inspector of steam-boilers (*Mead* v. *The City of New Haven*, 40 Conn., 72 ; 16 Am. Rep., 14) ; nor for the destruction of buildings to prevent the spread of conflagrations (*Russell* v. *The*

*Mayor*, 2 Denio, 461); nor for the action of its health authorities (*Ogg* v. *The City of Lansing*, 35 Iowa, 495; 14 Am. Rep., 499). These are all deemed to be within the range and immunities incident to its power of sovereignty.

We think that the evidence discloses the facts that the sickness and death here complained of, even assuming that it was traceable to the waters of this well, were attributable to the failure of the department of health to watch over the influences which might affect, or to examine, the water, or to take or call upon the city to take measures to prevent the public from using the well and pump. There was nothing in the plan of construction or method of execution of the plan for this well or the pump, which would suggest that the water was liable to become dangerous. As already observed, there is no suggestion that anything was out of order about either the well or pump, or sewers or the streets, in consequence of which the water was rendered impure. Its unwholesomeness was the result of natural causes, and was not attributable to the city in its private capacity, unless it was a part of its water supply, a point which we shall presently examine.

We come, then, to examine the question whether or not the charter imposes any statutory liability upon the city for an injury resulting from such a cause. Let us repeat that the simple fact that the charter grants power to appoint the officers of the department of health, and provides the means by taxation for the performance of their duties, does not meet the difficulty. These are all mere incidents of the exercise of sovereign powers. We do not understand that plaintiff claims that the charter goes farther than that, unless it be in this respect, that the health department of the city was limited to mere recommendation by which the duty of supplying a remedy was cast upon the city itself. We shall see, however, that the injury in this case did not result from the failure to apply a remedy, but from the lack of vigilance in apprising the city authorities of the occasion for activity. But, irrespective of this contention, we are satisfied that the charter does not impose the duty of watching over the quality of this water as affected by the natural sources of supply to this well. It does precisely what almost every other charter does for the municipality, viz., gives power to appoint

the head of the department, and is special in this respect, that it authorizes that department to provide a sanitary code, to be approved by the common council. Its provisions are broad enough to authorize the adoption of a complete system of rules and regulations, with fines and penalties for the infraction thereof; and we may, I think, take notice of the fact that such code has been adopted. We look in vain for any special provision which imposes any duty upon the city to exercise vigilance in matters affecting the public health, except through this department. It is, indeed, hinted that, inasmuch as this well was in one of the public streets, there could be no interference therewith, except through special direction of the common council to the department of public works. But the difficulty with this theory is that the city owed no duty respecting the causes which poisoned these waters, except through this department, and was not, therefore, bound to know that they were unfit for use until this department gave notice of, or until it acquired knowledge of the fact in some other way. The duty of vigilance, inspection, detection, analysis, etc., were with that department. So that the neglect, if any, was in its failure to inspect and require action by the common council. That being true, there was no relation of master and servant between this department and the city respecting this duty of vigilance upon which to predicate the liability of the latter. Hence we see that a clear distinction exists between the duties of this department and the city itself in respect to the causes which led to this difficulty.

The former was bound to exercise reasonable vigilance over influences which might affect this water, according to the plan by which it was collected. The latter was bound to keep its sewers and streets in such condition that the waters would not be polluted, and to keep the well and pump in proper repair. Hence knowledge or neglect of the means of knowledge, in respect to the natural quality of this water by this department, was not the knowledge or neglect of the city; and, therefore, the acts of adjudications of this department, respecting the natural quality of this water, were not material or competent evidence to charge the city with any active duty respecting it until they were brought to its attention. This conclusion disposes of the offers of evidence of the acts of the department of health. Nor was the fact that the city subsequently

acted on the theory that this water was unwholesome of any importance. (*Hunt* v. *Mayor*, 109 N. Y., 134.) There was no notice to the city, or knowledge by it, of this unwholesomeness until the department made its report, and that was fully three weeks after the plaintiff's intestate was dead and buried.

We do not mean, by any of these suggestions, to indicate that the health department was, or that any of its officers were, guilty of any neglect in the premises. On the contrary, we are inclined to think that the evidence failed to show any actionable neglect in that direction. But, since that question is not before us. it will subserve no useful purpose to discuss it. Suffice it to say that to hold the city for the acts or omissions or opinions of this department, before it was notified thereof, would add to the absurdities which are clearly pointed out by Mr. Justice DAY in *Ogg* v. *The City of Lansing*. We fail to see how its actionable character can be imputed to the city any more than Lees' neglect to notify Ogg could be attributed to the city of Lansing. Lees was the agent of the health authorities. He asked Ogg to assist in removing a corpse infected with small-pox, without disclosing the danger. It was held upon reasoning, the soundness of which we cannot doubt, that the city was not liable for the injuries which resulted to Ogg. And the same principle seems to apply to the causes for, and the fact of, the unwholesomeness of this water.

We have not overlooked the case of *Seifert* v. *City of Brooklyn* (*supra*). That was a case in which the city exercised its judicial functions, chiefly for its private benefit, in the private capacity to which we have alluded, and the influence thereof upon public health was purely incidental. Besides that, the element of negligence in the execution of the plan and in the use of the sewer by the city, as effecting a trespass, clearly distinguishes the case from that under consideration.

The case of *Chapman* v. *Rochester* (110 N. Y., 273) is clearly distinguishable from this one. There was no evidence admitted or offered which tended to show that the city polluted this well or the sources of the supply. For aught that appears, it did no act which led to the state of this water. Had it turned any part of the sewerage or surface water from the streets into the well, the case

would have been different. But there was no such element in the proof or offer of proof.

We do not think that the well in question was any part of the general system of water supply for the city. These public wells were isolated and independent contrivances for local convenience. The city derived no revenue from any of them. There was no element of a private business enterprise about them. The case of *Milnes* v. *The Mayor of Huddersfield* (L. R., 10 Queen's Bench Div., 124), is not in point. It related to water supplied by the city for the use of which it derived a revenue as a private enterprise, precisely as it might have done from gas, or any other business of a private nature. Lord Ch. J. COLERIDGE says: "Inasmuch as they were bound to supply him a wholesome article, and the whole carriage of the article from the reservoir to his house was through what belonged to and was under the domination of the corporation, the corporation would be liable." How was the city bound to supply anything from this well? Upon what consideration was it bound to do anything of the kind? Nor was there here any element of representation respecting the character of this water. The city had simply sunk a well to gather water which percolated through the earth in the ordinary way from the surface. The public could judge as well as the city authorities whether water thus collected was likely to be pure or impure, while in the other case the city professed to go away to sources remote from the observation of consumers and convey water by artificial means, for hire, into consumers houses or to convenient points for their use. This approximates a representation like that which is impliedly made by every offer of food for consumption. Undoubtedly where a city supplies water for domestic use, and receives pay, it is bound to furnish wholesome water and is liable if it does not, but this is not such a case. Assuming the correctness of the views which we have presented, it will be unprofitable to further consider the matters suggested in the able and exhaustive brief presented by appellant's counsel.

The judgment is affirmed, with costs.

BARNARD, P. J., and DYKMAN, J., concurred.

Judgment affirmed, with costs.