SAFRANSKY, Respondent, *v.* CITY OF HELENA, Appel-
LANT.

(No. 7,333.)

(Submitted November 16, 1934. Decided January 3, 1935.)

[39 Pac. (2d) 644.]

458

Mr. *John W. Mahan* and *Messrs. Gunn, Rasch, Hall & Gunn,* for Appellant, submitted an original and a reply brief; *Mr. Mahan* and *Mr. E. M. Hall* argued the cause orally.

*Mr. Wellington D. Rankin* and *Mr. Arthur P. Acher,* for Respondent, submitted a brief; *Mr. Rankin* argued the cause orally.

464

466

*Mr. R. Lee Word, Sr., Mr. E. G. Toomey* and *Mr. R. Lee Word, Jr., Amici Curiae,* submitted a brief; *Mr. R. Lee Word, Sr.,* and *Mr. Toomey* argued the cause orally.

Opinion: PER CURIAM.

The plaintiff, Ralph E. Safransky, brought this action to recover damages which he alleges resulted from drinking contaminated water furnished by the city of Helena, and from which he contracted typhoid fever. His complaint alleges that the city of Helena, a municipal corporation, maintained, managed, owned and controlled a water supply system from which it furnished water for drinking and domestic purposes on a rental basis, and in the conduct of that business it furnished water to the residence of plaintiff and his wife. That it was the duty of defendant to provide plaintiff with pure, wholesome water for drinking and domestic purposes, and that it further was defendant's duty to prevent sewage, drainage, refuse or other polluting matter from being discharged into its system and contaminating the waters carried therein.

It is then alleged that, for more than five weeks immediately preceding the time when plaintiff was stricken with typhoid fever, the defendant, its agents, officials, servants and employees had negligently, carelessly and recklessly allowed the water to become contaminated with filth and fecal matter, and particularly with bacilli coli or typhoid fever germs; that defendant had knowledge of this condition, but failed to remedy it, and failed to warn the plaintiff that the water was unfit for human consumption. That plaintiff, without knowledge of this situation, drank the water furnished by defendant for that purpose, and, in consequence thereof, and on or about the fifteenth day of September, 1929, contracted typhoid fever. That because of the resulting serious illness he was confined in a hospital from September 30, 1929, to November 2, 1929.

It is further alleged that plaintiff had followed the occupation of railroad fireman, but, because of his weakened condition resulting from typhoid fever, he will never be able to again follow that occupation; that he was totally disabled for a period of six months, and that he is now unable to perform any heavy manual labor. Because of these negligent acts and the sickness and disability resulting therefrom, plaintiff claims damages in the sum of $20,000.

For a second cause of action plaintiff alleges that defendant, for a period of more than five years prior to the bringing of this action, had maintained above its water-pipe line running along West Main Street, and especially at the junction of West Main Street with Pacific Street, a sewer system and sewer-pipe line; and that defendant, and its officials and employees, knew or ought to have known that a break in this sewer line would likely result in sewage percolating through the soil and into the water-pipe line, thereby contaminating the water flowing therein with typhoid fever germs; that the defendant, prior to September 15, 1929, negligently failed to have or maintain a reasonable system of inspection for the purpose of discovering leaks in its sewer and water pipes, and, as a consequence, failed to detect a leak in its sewer line, with the result that sewage, contaminated with typhoid fever germs, found its way into the water flowing in the water-pipe line below.

For a third cause of action plaintiff alleges that, some time prior to plaintiff's illness, the defendants, its officials and employees, negligently constructed and maintained this sewer line along West Main Street, and above the water-pipe line, so that sewage was likely to percolate to and enter the water-pipe line; that the defendant, its officials and employees, knew or ought to have known that sewage would find its way into the water-pipe line, and that for more than five weeks before plaintiff's illness the water in the pipe line did become contaminated with typhoid fever germs from the sewage.

The defendant moved to strike certain portions of each cause of action set out in the complaint. This motion was overruled. It then filed a general and special demurrer to each cause of

action. These demurrers were also overruled. The defendant then answered, admitting that it was a municipal corporation, that it owned and operated a water supply system furnishing water for drinking and domestic purposes to the residents and inhabitants of the city of Helena, and that the water furnished by it to the plaintiff was from its Eureka system. All the other allegations of plaintiff's complaint were denied.

Plaintiff's reply, alleging a lack of knowledge or information sufficient to form a belief, denied that the water furnished him by defendant was from the Eureka system.

The cause was tried to a jury. At the close of 'plaintiff's case, defendant moved for a nonsuit, which motion was denied. At the close of all the testimony in the case, defendant moved for a directed verdict, which motion was also denied. The jury returned a verdict for plaintiff for $1,500, and judgment was entered.

Defendant appeals directly from the judgment, assigning twenty-five specifications of error. Fifteen of these are directed to instructions refused and instructions given. The others are directed to error in overruling motion to strike from the complaint, in overruling the demurrers to the complaint, in overruling the motions for nonsuit and directed verdict, and in the admission of certain exhibits and testimony.

The defendant in its brief questions the correctness of the former decision of this court on two points decided in the case of *Campbell* v. *City of Helena,* 92 Mont. 366, 16 Pac. (2d) 1. These two points are:

First, do the laws creating a State Board of Health and subordinate county and city health departments take the control of water systems out of the hands of the city, so as to relieve it of its duty to maintain a pure water supply? and,

Second, does the law require one injured in the manner plaintiff alleges he was injured to give notice to the city as a condition precedent to his maintaining an action for damages?

In the case of *Campbell* v. *City of Helena,* supra, both these questions are answered in the negative; and now, after a full and complete investigation of all authorities cited by appellant,

we find nothing which would tend in any matter to alter our former decision.

Defendant's first contention is that plaintiff has not proved that defendant was negligent. The evidence shows that the city of Helena furnished water to its users through a number of independent systems. The Eureka system has its source at bedrock, about forty feet below the surface, at the upper end of South Main Street. From there it is conveyed in a vitrified tile pipe by gravity to a sump at the corner of Park and Wall Streets, where an overflow connects it to the Last Chance Gulch drain. From this point the line continues in cast-iron pipe under pressure, and is carried down to and supplies the Sixth ward of the city. Its pressure is derived originally from the natural head of water in the sump, and it is gradually augmented by a continuing downgrade flow from the sump to the Sixth ward. In 1929, its flow would vary, depending on the season of the year, from 400,000 to 900,000 gallons à day.

Dr. J. H. Crouch, epidemiologist of the State Board of Health, testified to the number of cases of typhoid fever in the city of Helena in recent years as follows: 1922, none; 1923, three; 1924, two; 1925, one; 1926, three; 1927, two; 1928, none; 1929, one hundred and eighty cases of residents of Helena, and thirty-one cases of people residing elsewhere, but who had recently visited Helena, or a total of two hundred eleven cases in all for 1929. He further testified that in 1929 the first case had its onset on July 23, the second on August 7, the third on August 20, and that for a time thereafter the number of cases increased daily.

This witness testified further that the first case traceable by him to the Eureka water was on August 20, and the second on August 21; that a total of nine cases had their onset in August; that in cases infected with the typhoid germ the average period of incubation is about two weeks, but it may be as long as three weeks. During this epidemic in Helena the shortest period of incubation was eight days, and the longest sixteen days. The greatest number of cases reported in one day was ten, reported on September 17. The city began the chlorination of the

Eureka water on September 16. Two weeks later, on October 2, only one case was reported. It was the decrease in cases reported following chlorination upon which Dr. Crouch advanced a very decided opinion that the Eureka water was the immediate source of the infection.

On September 14 (or 16, there being some dispute as to date), Mr. H. B. Foote, director of the division of water and sewage of the State Board of Health, Dr. Crouch and Dr. Arthur Jordan, city health officer, after an inspection of the city water system, called upon the city council and discussed with its members the probability of the typhoid epidemic being traceable to contamination in the city water system. At this meeting, and at 12 o'clock noon, the State Board of Health recommended the chlorination of the Eureka water, and a chlorination system was installed and was in operation by 5 o'clock P. M. the same day. Chlorination was continued until September 26. Since that date the Eureka water has not been used as a source of city water supply.

Plaintiff called many witnesses who testified to the bad odor and taste of the city water in the Sixth ward during the summer of 1929, some of whom reported it to Dr. Jordan in the month of August. Defendant, in turn, called many witnesses who testified that the Sixth ward water had neither a bad taste nor odor.

William W. Casper, a reporter for the Montana "Record Herald," testified that during the month of August, 1929, many people in Helena had telephoned to the news department inquiring about the typhoid fever epidemic which they were informed existed in Helena. He testified that two or three days prior to August 27, 1929, he had discussed the matter with Mayor Percy Witmer, and that on that date he secured an interview with both the mayor and the city health officer regarding the condition of the city water, and that they both advised him that there was absolutely no cause for alarm concerning the purity of Helena's drinking water, assuring him that, although it might taste and smell of algae, it was pure; that algae (a water plant), while creating an unpleasant

odor and taste, is harmless, and that the Helena water contained nothing to cause uneasiness, and that it was unnecessary to boil the drinking water. The witness testified that the substance of his interviews was published in the "Record Herald" on August 27, 1929.

At the time of the trial of this action, Dr. Arthur Jordan, city health officer, had died, but by stipulation of counsel his testimony, taken at a former trial of another action, was read into the record. His testimony was to the effect that he took samples of the city water supply every month, except when he got a bad sample, and then he would check on it. In a report received by him from the State Board of Health on August 6, a sample of Eureka water, taken at Shaeffer's Service Station in the Sixth ward on August 2, 1929, showed positive bacilli coli. On August 7, at the same place, a check sample was taken. On August 9, Dr. Jordan and family left the city of Helena, going to Lincoln, Montana, where the witness did some work as county health officer and some fishing. He returned to Helena on August 15. He could not testify when he first learned that the sample of Eureka water taken by him on August 7 contained positive bacilli coli, but it was a few days after his return on August 15. During his absence he instructed his office girl to forward the reports received from the State Board of Health to Joe Lupien, superintendent of the city water plant, as it was his custom to show all reports on city water to Lupien. On August 26 the witness took another sample of Eureka water at the same place. He was out in the country for the next few days, and four or five days later he saw the report from the State Board of Health stating that this sample also showed positive bacilli coli. From August 7 to August 26 witness took no samples from the Helena water system.

Bacillus coli is in itself harmless. It is bacillus typhosus that causes typhoid fever. This is found only in the excretion of human beings who are typhoid carriers. The finding of bacillus coli in water analyses is an indication of some foreign substance or contamination in the water. Its presence creates

472

a suspicion and indicates a possibility of the presence of bacillus typhosus, and a warning that immediate combative action is necessary. It is very difficult to isolate the typhoid germ Ordinarily, only three or four persons in a thousand are typhoid carriers. In open or surface water supply systems animal bacillus coli is frequently present, but animal bacillus coli never carries bacillus typhosus. The Eureka system of the Helena water supply originates in an underground spring and never reaches the surface. It is, therefore, not easily impregnated with bacillus coli so long as no break exists in the underground pipe line and through which the water may become contaminated.

The Ten Mile system of the Helena water supply is an open system, and tests frequently showed presence of bacillus coli. In cases of fire in the Sixth ward, and to give greater pressure, the Ten Mile system was turned into the Eureka system. A fire had occurred in the Sixth ward on July 29, 1929, and another one on August 5, 1929, and in both instances Ten Mile water had been turned into the Eureka system. There is no testimony showing whether or not Dr. Jordan had knowledge of these fires or that Ten Mile water had displaced or was commingled with Eureka water in the Eureka system.

The evidence all shows that the Eureka water system was constructed along bedrock about 1882 by private individuals engaged in mining, and that at its upper end it was forty feet below the surface, and about twenty-two feet below the surface at Pacific Street, and that the Helena Water Company acquired it about 1901; that if there was any record of its location, it was probably lost in 1901, when the office of the Helena Water Company was destroyed by fire. The city purchased the system in 1911.

The sewer system on West Main Street was installed by the city about 1888, according to recognized standards of that time. The sewer line is located about ten feet above the water-pipe line where the two cross. On or about September 30, 1929, the city caused the water line and the sewer line to be exposed at a point near where they crossed, and discovered a break in the sewer line within a few feet of the point where

the sewer line passes over the Eureka pipe line. Sewage had backed up in a sewer manhole at the point of the break. All witnesses testify that the ground around the manhole was impregnated with sewage. The Eureka water line was constructed of tile pipe from twenty-four to thirty-six inches in length, with cement joints. The sewer line was constructed of cement pipe, thirty inches in length. About five or six feet from the manhole the ground had sunk, allowing the sewer-pipe to sag, causing the break referred to. The first or second pipe length from the manhole had settled and sheared away. There is also testimony that a broken water service pipe in a residence a short distance above the point of the sewer line break was draining down towards the manhole. Several witnesses testified as to depressions in the street as early as July, 1929, near the point where the sewer was broken, and of trucks getting into the holes, to the knowledge of Mayor Witmer. Two or more of these holes had been filled in by the city prior to the discovery of the break in the sewer, the largest one having been filled in in August, 1929. After the break in the sewer had been discovered, the city caused a fluorescein and salt test to be made to determine whether water coming out at the place where the sewer was broken was getting into the Eureka pipe line. The results were negative.

The foregoing evidence was ample to sustain a finding by the jury that defendant had failed to use reasonable care to see that the water which it supplied for human consumption was pure. This was the duty enjoined upon the city when it undertook to furnish water to its inhabitants. (*Missoula P. S. Co.* v. *Bitter Root Irr. Dist.*, 80 Mont. 64, 257 Pac. 1038; *Campbell* v. *City of Helena*, 92 Mont. 366, 16 Pac. (2d) 1.)

The city contends, however, that, if it be assumed that notice and knowledge of the condition of the water on the part of Dr. Jordan, the city health officer, was notice to the city, there was yet not sufficient evidence of negligence, because the only notice and knowledge possessed by Dr. Jordan in time to take any precautionary measures was notice of the presence of bacilli coli in the water, and that this was not notice of the presence of typhoid fever germs. However, there is ample

evidence in the record from which the jury was permitted to find that the presence of bacilli coli in drinking water was notice calling for immediate combative action, and that a reasonably prudent person, in the existence of reasonable care, would have taken precautionary measures under the circumstances known to exist, long prior to the time plaintiff drank the water. (Compare *Hayes* v. *Torrington Water Co.*, 88 Conn. 609, 92 Atl. 406; *Pennsylvania R. Co.* v. *Lincoln Trust Co.*, 91 Ind. App. 28, 167 N. E. 721, 170 N. E. 92; *Hamilton* v. *Madison Water Co.*, 116 Me. 157, 100 Atl. 659, Ann. Cas. 1918D, 853.)

Here it is shown that the water supply could easily have been chlorinated as it was done after plaintiff contracted typhoid fever, and it is also shown that the water supply could easily have been shut off or the public advised to boil the water before using it. No such precautions were taken; on the contrary, the public was advised through the public press that there was nothing wrong with the water. That the water ██ contained typhoid fever germs is fairly inferable from the fact that, after the sewer was repaired, the water was shown by tests to be pure, and that after the water was chlorinated there was a sharp decrease in the number of typhoid fever cases, and that shortly thereafter no further cases developed at all. Proof by circumstantial evidence is sufficient. (*Wiesner* v. *City of Albany*, 224 App. Div. 239, 229 N. Y. Supp. 622, 624; *Stubbs* v. *City of Rochester*, 226 N. Y. 518, 124 N. E. 137, 5 A. L. R. 1396; *Jones* v. *Mt. Holly Water Co.*, 87 N. J. L. 106, 93 Atl. 860.) The case, therefore, differs from that of *Georgia P. & L. Co.* v. *Baxter*, 47 Ga. App. 727, 171 S. E. 309, so strongly relied upon by defendant, where the verdict was held to rest upon speculation as to the source of the germs.

Defendant contends that, as to the second and third causes ██ of action, which relate to the construction and maintenance of its sewers, it cannot be held liable, because, in the exercise of those functions, it operates in a governmental, and not a proprietary, capacity, and that therefore its motion to

withdraw these causes of action from the jury should have been sustained.

It is true that in the operation and management of its sewerage system the city acts in a governmental capacity and is ordinarily not liable for errors of judgment. (43 C. J. 1125; *Hughes* v. *City of Auburn*, 161 N. Y. 96, 55 N. E. 389, 46 L. R. A. 636; *Pevear* v. *City of Lynn*, 249 Mass. 486, 144 N. E. 379; *Neese* v. *City of Atlanta*, 45 Ga. App. 376, 165 S. E. 165; *Hutchinson* v. *City of Lakewood*, 125 Ohio St. 100, 180 N. E. 643; Dillon on Municipal Corporations, 5th ed., 1744.) But it does not follow that it can furnish water to its inhabitants which it knew, or in the exercise of reasonable care should have known, was polluted with sewage escaping from a defective sewer-pipe, without assuming liability for damages occasioned thereby. The governmental function in caring for the sewerage system cannot be so completely divorced from the proprietary function of furnishing water to the people of the city as to render the city immune from liability.

The protection of the water from pollution and the correction of a condition brought about by the negligent care of a sewer main became a part of the corporate duty of the city in carrying out its proprietary function of furnishing wholesome water. (*Denver* v. *Maurer*, 47 Colo. 209, 106 Pac. 875, 135 Am. St. Rep. 210, cited and quoted from in *Griffith* v. *City of Butte*, 72 Mont. 552, 234 Pac. 829, and in *Campbell* v. *City of Helena*, supra.)

It is also contended by the city that there was no proof of ██ negligence on its part in connection with the management of its sewer system. In the consideration of this question, we must, of course, view the evidence in the light most favorable to plaintiff wherever it is conflicting. Thus viewing it, we find sufficient from which the jury was warranted in finding that the depression in the street near the point where the sewer-pipe was found to be broken had existed a sufficient length of time, with knowledge on the part of the city, to put it on notice that there might be a break in the sewer-pipe calling for more than usual care in inspecting it. Similar facts have been held sufficient to present a jury question, in

*R. & R. Candy Co.* v. *City of New York,* 216 App. Div. 468, 215 N. Y. Supp. 521; *Cardiff Light & Water Co.* v. *Taylor,* 73 Colo. 566, 216 Pac. 711; and compare *City of Salem* v. *Harding,* 121 Ohio St. 412, 169 N. E. 457.) The fact that the fluorescein and salt tests showed negative is not conclusive in the light of the testimony of Mr. H. B. Foote, who said that he did not consider these tests adequate to determine the question whether the solutions would get into the Eureka water.

The motion to withdraw these causes of action from the jury, made at the close of the evidence, was properly denied.

It is next contended by defendant city that plaintiff failed to prove knowledge on its part that the water was germ laden. This contention is based upon four separate grounds: (1) That notice to Dr. Jordan was not notice to the city, since he was a subordinate officer of the State Board of Health; (2) that, if Dr. Jordan was negligent, it was negligence in the performance of a governmental function, and for his mistake or error in judgment the city is not liable; (3) that the city, in appointing Dr. Jordan local health officer, was merely an instrumentality designated by the state law to assist the State Board of Health, and that his appointment did not make him a servant of the city for whose acts the city would be liable; and (4) that, if he was the city's servant, since he was a physician, the city would not be liable for his errors or mistakes.

It is well settled, as the city contends, that the city and state, in the performance of duties relating to the preservation of the public health, generally speaking, act in a governmental capacity. (43 C. J. 971.) But it does not follow that notice to the local health officer appointed by the city, of the fact that the water furnished by the city is polluted, is not notice affecting the city. It has been held that notice to the health officer is some notice to the city. (*Roscoe* v. *City of Everett,* 136 Wash. 295, 239 Pac. 831; *Pennsylvania R. Co.* v. *Lincoln Trust Co.,* 91 Ind. App. 28, 167 N. E. 721; rehearing denied in 91 Ind. App. 28, 170 N. E. 92.)

The city relies upon the case of *Danaher* v. *City of Brooklyn,* 51 Hun, 563, 4 N. Y. Supp. 312, as sustaining its con-

tention. That case is distinguishable on the facts. In that case the damage to plaintiff was caused by drinking water from a public well, which was no part of the general system of water supply for the city. The city derived no revenue from the well. It was not operating the well as a private business enterprise.

The fact that the local health officer is under the general supervision of the State Board of Health does not divest the city of supervision over him. Dr. Jordan received his salary from the city, and, according to the record, was removable at the pleasure of the city council. He was required to obey the orders of the State Board of Health in matters affecting public health generally, but was not free to ignore the commands of the city with reference to seeing that the water it furnished to the inhabitants of the city was pure, unless, as we suggested in *Campbell* v. *City of Helena,* supra, there be present a case where he is obeying the mandates of the State Board of Health. The local health officer, though denominated an "officer" in the statute, is in fact not an officer, but a servant or agent; and, though the statute denominates his position as an office, it is in fact merely an employment. (*Middleton* v. *Miller County,* 134 Ark. 514, 204 S. W. 421; *Harrington* v. *State,* 200 Ala. 480, 76 So. 422.) Here, Mayor Witmer testified that "the health officer was the person who represented the city to see that the water was pure. I mean Dr. Jordan. * * * He was selected health officer and that was one of his duties, among other things."

It was also shown, without conflict, that the reports showing the presence of bacilli coli in the water were received by Joseph E. Lupien, foreman of the city water department. Martin Doty, a city commissioner and a witness for defendant, testified that Mr. Lupien was also supposed to look after "and see that we got pure water; I think he did on orders from Dr. Jordan." Lupien made it plain by his testimony that he paid no attention to the samples unless there was some specific direction or recommendation made by the health officer.

It is plain from all the evidence that all of the officers of the city relied upon Dr. Jordan, the health officer, to look after

the purity of the water and to make recommendations. The city, in the discharge of its duty to look after the purity of its water, acted through its health officer, Dr. Jordan, or not at all, and notice to him was notice to the city.

The situation is no different from that where a private water company, in the discharge of its duty to provide wholesome water, had employed the city health officer for some additional compensation to do so for the company. The company, in discharging that duty, must act through some individual, and, if it selects the city health officer as its agent for that purpose, notice to the agent is notice to the principal. The evidence establishes that this duty was delegated by the city to its agent, the city health officer, and the city was chargeable with notice brought to him.

What we have said also disposes of the second and third points above stated, for, when the city relied upon Dr. Jordan as its agent to look after the purity of its water, he became to that extent an agent of the city in carrying on its proprietary function of selling water to the public. (Compare *Denver* v. *Porter*, (C. C. A.) 126 Fed. 288.) The fact that Dr. Jordan was a physician, duly licensed as such, does not alter the rule. In the proper discharge of his duty here, he was not treating a patient as in the cases relied upon by the city. Nor was there involved any technical skill or knowledge.

The question here involved is whether it was error to instruct the jury that the receipt by Dr. Jordan of reports from the State Board of Health showing the presence of bacilli coli constituted notice to the city of what was contained in the reports. There is here no attempt to hold the city for the negligence of Dr. Jordan. The negligence is that of the city in not taking proper precautions to safeguard its water users after receiving this notice which, if followed up with diligent inquiry, would have prompted a reasonably prudent person to take some precautionary measures. The city being chargeable with this notice, the case is on a parallel with that of *Wiesner* v. *City of Albany*, supra, where the court said: ''The exercise of vigilance would have led to discovery of the dangerous condition, and reasonable diligence would have pro-

vided the remedy. * * * Common prudence would have suggested a notice to citizens that the water had become polluted, and a recommendation that all water intended for human consumption should be boiled. But no preventive measures were taken until an epidemic had broken out. The presence of bacilli coli in water indicates contamination from human sources. Many types are harmless, in the sense that they do not furnish the origin of disease. The typhoid bacilli (scientifically known as 'B-typhosus') are the well-recognized cause of typhoid fever. While they are difficult of isolation, they belong to the colon group, and the presence of bacilli coli in water indicates that there is grave danger that the typhoid bacilli are also present, and this becomes a practical certainty when there is an outbreak of typhoid fever, not directly traceable to other sources of infection."

Error is assigned in admitting evidence of the taste and odor of the water furnished by the city in the Eureka system. Under the circumstances here it was not error to receive this evidence. The source of the Eureka water was at bedrock, the supply originating in an underground spring and never reaching the surface. It was not easily contaminated. In an action of this character, if the water suddenly developed a bad taste and odor, the existence of that fact and the communication of its existence to the city authorities would be admissible. While there was no proof, at the time this class of evidence was first offered, that the bad taste and odor in the water suddenly developed, there was no objection based on the absence of proof of the sudden appearance of such taste and odor. The evidence was proper to be considered by the jury in determining whether defendant acted as a reasonably prudent person in taking steps to determine the cause thereof, and whether it took proper precautions to avoid plaintiff's illness. (Compare *Aronson* v. *City of Everett*, 136 Wash. 312, 239 Pac. 1011; *Stubbs* v. *Rochester*, 226 N. Y. 516, 124 N. E. 137, 5 A. L. R. 1396; *Pennsylvania R. Co.* v. *Lincoln Trust Co.*, supra; *Kohlmeyer* v. *Ohio Valley Water Co.*, 58 Pa. Super. Ct. 63.)

After the ruling on the objection had been made and the testimony as to the taste and odor received, it appeared on the trial that, on a number of occasions in the summer of 1929, the water from the Ten Mile system had been turned into the Eureka water system for use in fighting fires. It also appeared that the water from the Ten Mile system at the time of its influx into the Eureka system presented both a bad taste and odor, which was known to the city authorities. If the subsequently developed facts had been in the record at the time of the objection and the reception of the evidence, it is doubtful if the evidence as to taste and odor should, in such circumstances, have been admitted. But such was not the state of the record at the time of the admission of the evidence.

The city also contends that it was error to admit exhibits ▉ showing the presence of bacilli coli in the water after plaintiff became ill. These were properly admitted as proof tending to show the source of the germs causing his illness. (Compare *Ritterbusch* v. *City of Pittsburg*, 205 Cal. 84, 269 Pac. 930, 61 A. L. R. 448; *Hayes* v. *Torrington Water Co.*, 88 Conn. 609, 92 Atl. 406.)

Error is assigned in admitting in evidence an admission ▉ made by the city in an answer filed in a similar action by plaintiff's wife. That admission was as follows: "That the contamination alleged by the plaintiff, if there were such contamination, was caused by sewage escaping through a break and defect in a sewer near the intersection of Pacific Street and West Main Street in said City of Helena." In brief, the city contends that the admission was made by counsel for the city in an effort to raise the question whether notice must be presented to the city before commencing action; that the answer was not verified; that there was no proof that the admission was known to any member of the city council, and that a subsequent amended answer had already been filed in that case, wherein this admission was not made. The fact that an amended answer had been filed was not called to the court's attention at the time the evidence was offered. Neither

was there any objection made to the evidence upon any of the grounds now relied upon, nor any evidence to support the grounds contended for. Under the circumstances, the admission in the answer was properly received in evidence. The subsequent amendment or withdrawal of the pleading did not affect its admissibility (*Gardiner* v. *Eclipse Grocery Co.*, 72 Mont. 540, 234 Pac. 490; *Hester* v. *Western Life & Accident Ins. Co.*, 67 Mont. 286, 215 Pac. 508; *Beery* v. *Glynn*, 214 Iowa, 635, 243 N. W. 365; *Streipe* v. *Liberty Mut. Life Ins. Co.*, 243 Ky. 15, 47 S. W. (2d) 1004; 22 C. J. 327), particularly where that fact was not brought to the attention of the court at the time the evidence was offered.

By instruction 27 the court instructed the jury, in effect, that plaintiff might prevail if any one cause of action were established, and that it was not incumbent upon him to prove all of the causes of action alleged. Such an instruction is proper. (*Pierce* v. *Safeway Stores*, 93 Mont. 560, 20 Pac. (2d) 253.)

Complaint is made of instruction No. 20, reading as follows: ''It is sufficient to entitle the plaintiff to recover if the plaintiff proves by a preponderance of the evidence that said water was contaminated, regardless of the source or cause of such contamination, or whether or not the city of Helena caused such contamination, if any, provided you further find that the city of Helena knew, or in the exercise of reasonable care and diligence should have known of said contamination in sufficient time to have prevented the plaintiff from contracting typhoid fever from drinking said water, and provided you further find the city negligently failed to do so, if you find from a preponderance of the evidence that he did contract typhoid fever therefrom.''

It will be remembered that plaintiff alleged in the second and third causes of action the particular cause of the contamination. He did not do so in the first cause of action. The effect of the instruction was that, if plaintiff proved the elements of the first cause of action, he was entitled to recover. The instruction was proper.

Over defendant's objection, instruction No. 19 was given. It reads: "You are instructed that actual notice or knowledge of the unwholesome character of the water, if it was such, is not an essential element to be proven by the plaintiff, with other elements as in these instructions defined, in order to establish liability on the part of the city. It is sufficient notice if it is shown by a preponderance of the evidence, that the city, in the exercise of reasonable care, might have discovered the unwholesome and dangerous character of the water, if such was its character."

The instruction, standing alone, is indefinite as to when notice must be brought to the city before there could be liability; but, when read in connection with others given, it is apparent that it could not have misled the jury. It was made clear by the instructions as a whole that, before there could be liability, the city must have had notice in time to prevent plaintiff's illness before there could be recovery.

What has already been said disposes of defendant's contentions with reference to the giving of an instruction to the effect that notice to Dr. Jordan was notice to the city, and to the refusal to give one, offered by defendant, of the opposite effect.

What has been said heretofore also disposes of the objections of defendant to the giving of instruction No. 5 and to the refusal to give defendant's offered instructions 5 and 7.

Defendant offered an instruction reading as follows: "The laws of the State of Montana provide that the State Board of Health shall have power to promulgate and enforce such rules and regulations for the better preservation of the public health in contagious and epidemic diseases as it shall deem necessary, and also regarding the causes and prevention of diseases, and their development and spread; and any person or corporation refusing, after notice in writing from the secretary of the State Board of Health, or from any local or county board of health, of such rules and regulations, to comply therewith, within a reasonable time, shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined

in a sum not less than ten nor more than one hundred dollars, with cost of prosecution. The law also provides that in all cases the State Board of Health shall have supervisory control over the action of all local county, city, or district health officers, who shall in all respects be subject to the direction of the state board." Error is assigned on refusal of the instruction. It was properly refused. (*Cashin* v. *Northern Pacific Ry. Co.*, 96 Mont. 92, 28 Pac. (2d) 862.)

Other offered instructions of defendant were refused, and error is assigned in so doing. We have considered such assignments and find the offered instructions were properly refused.

No error appearing in the record, the judgment is affirmed.

Mr. Chief Justice Callaway, Associate Justices Angstman, Matthews and Anderson, and The Honorable R. E. McHugh, District Judge, sitting in place of Mr. Justice Stewart, disqualified, concur.