NELLIE O. PEVEAR & others *vs.* CITY OF LYNN.

THOMAS J. BAKER *vs.* SAME.

AMOS B. CHASE *vs.* SAME.

Essex.          March 3, 1924. — June 12, 1924.

Present: RUGG, C.J., BRALEY, DECOURCY, CROSBY, & CARROLL, JJ.

*Municipal Corporations,* Sewer. *Sewer. Negligence,* Of municipality in maintenance of sewer.

A municipality is not responsible for damages which accrue to individuals through any defect or inadequacy in the plan of its system of sewers, because that is established by public officers acting, not as its agents, but in a *quasi* judicial capacity for the benefit of the general public; but it is responsible for damages which accrue to individuals through negligence in the construction, maintenance or operation of its system of sewers, because that system when constructed becomes the property of the municipality, no one else can interfere with it and its care and continuance devolve wholly upon the municipality through such agents as it may select. Per RUGG, C.J.

Findings by an auditor and other evidence introduced at the trial of an action of tort against the city of Lynn for damages alleged to have resulted from negligence in the construction, maintenance, and operation of its system of sewers were *held* to warrant findings of negligence on the part of the defendant in permitting the permanent and unrestrained flow into its system of sewers of the waters of Stacey's Brook, including the waters of Floating Bridge Pond, and also in permitting the collection in the sewers of sediment and other solid materials, so that damage to the plaintiffs resulted therefrom; and therefore a motion for a verdict for the defendant was properly denied and a verdict for the plaintiff was warranted.

THREE ACTIONS OF TORT for damages to the premises of the respective plaintiffs due to the alleged improper main-

tenance of the sewer system of the defendant in causing Stacey's Brook, a natural stream, to flow into a sewer, and by permitting the sewer to become choked so that water was backed upon the premises of the plaintiffs. Writs dated respectively October 19, 1915, November 3, 1915, and March 1, 1916.

In the Superior Court, the actions were referred to an auditor and thereafter were tried together before *Quinn,* J. Material evidence and findings by the auditor are described in the opinion. Motions for verdicts in favor of the defendant were denied. At the close of the evidence, the defendant asked for the following rulings:

" 1. On all the evidence, the plaintiffs are not entitled to recover.

" 2. There is no evidence of any negligent maintenance of the sewers which contributed to the flooding of the plaintiffs' premises.

" 3. There is no evidence to overcome the auditor's finding that the solid matter in the Market Street side sewer did not contribute to the flooding of the plaintiffs' premises.

" 4. The interpretation of the Hering report is for the court. The Hering report provides for confining the waters of Stacey's Brook in the sewer and the turning of Stacey's Brook waters into the Stacey's Brook main sewer is not a negligent act or maintenance to make the defendant liable in these actions."

The following verdicts were returned: for the plaintiff Pevear in the sum of $6,500, for the plaintiff Baker in the sum of $7,385.08, and for the plaintiff Chase in the sum of $1,654. The defendant alleged exceptions.

*S. Parsons,* (*P. F. Shanahan* with him), for the defendant.

*E. S. Underwood* & *J. W. Sullivan,* for the plaintiffs.

Rugg, C.J. These are actions of tort to recover compensation for damages resulting from a flooding of the premises of the several plaintiffs. Each cause of action is founded on alleged negligent maintenance of the sewer system of the defendant.

The law governing actions of this nature is settled. A

municipality is not responsible for damages which accrue to individuals through any defect or inadequacy in the plan of its system of sewers, because that is established by public officers acting, not as its agents, but in a *quasi* judicial capacity for the benefit of the general public.   A municipality is responsible for damages which accrue to individuals through negligence in the construction, maintenance or operation of its system of sewers, because that system when constructed becomes the property of the municipality, no one else can interfere with it and its care and continuance devolve wholly upon the municipality through such agents as it may select. *Child* v. *Boston,* 4 Allen, 41.   *Buckley* v. *New Bedford,* 155 Mass. 64.   *Manning* v. *Springfield,* 184 Mass. 245.   *Robinson* v. *Everett,* 191 Mass. 587.   *Diamond* v. *North Attleborough,* 219 Mass. 587.

These cases were referred to an auditor, who reported at length.   They then were tried to a jury upon the report of the auditor and oral testimony chiefly from hydraulic and sanitary experts.   Verdicts were returned in favor of the several plaintiffs.   The cases are here on exceptions.

The property of the several plaintiffs was located upon one of the chief streets near the business centre of the defendant city and apparently upon land only slightly above the level of the sea.   The damages of which they complain were caused by water flowing into the basement and first floor of their building and stores during a brief but exceedingly heavy downpour of rain in July, 1915, and in August, 1916. The plaintiffs contended that this flooding was caused by the negligence of the defendant in caring for and maintaining its system of sewers, while the defendant contended that, so far as the flooding resulted from its sewers, it was due to an inadequate plan.   The cases finally were submitted to the jury on two issues only; first, whether the damage to the plaintiffs was caused in any part by negligence of care and maintenance in running the waters of Stacey Brook continuously into the sewer, and second, whether the damage to the plaintiffs was caused in part by deposits of sediment negligently allowed by the defendant to accumulate in the Market Street sewer.

By reason of bad conditions existing in 1884, the defendant employed an engineer to study its sewer system. He made an exhaustive report. In November of that year the city council of the defendant adopted an order authorizing the committee on drainage " to construct the Eastern Intercepting Sewer and Stacey's Brook Main sewer as recommended in the report and plan of Mr. Herring, C.E., and that the Committee employ an engineer to lay out and superintend the work." Manifestly this was an adoption of the Hering plan with reference to Stacey's Brook main sewer, which emptied into the Eastern Intercepting sewer. No question is raised as to the construction of these sewers in accordance with the sizes thus recommended and adopted. The controversy concerns the proportion of the waters of Stacey's Brook which by the plan were designed to flow into the Eastern Intercepting sewer. Stacey's Brook was in 1884 a natural stream having its source in Floating Bridge or Glenmere Pond, which it drained, and flowing through a meadow to the sea. It had then become considerably polluted by house drainage. The auditor found that the Hering report and plan were comprehensive and in great though not complete detail. " Vital features were left to the recommendation and to the discretion of the construction engineer," as contemplated by the plan and the order. The Hering report contemplated the reception of a portion of the surface water " from Stacey's Brook and provided for the location of two flushing gates along its course. These two flushing gates were located one at the intersection of Chatham Street with Marianna Street, and one at the intersection of Chatham Street with Saratoga Street. These flushing gates were at the bottom of the bed of the brook and so constructed that they could be opened and shut at will, thus permitting or preventing the flowage of water from Stacey's Brook itself into the sewer. By this means the flow of surface water into the sewer could be largely controlled. On June 10, 1890, the Board of Mayor and Alderman passed a vote instructing the city engineer to open these gates and turn the waters of Stacey's Brook into the sewer temporarily. Apparently from this time certainly for many years prior to 1915 the

use of these gates for controlling the flow of surface water into the sewer, was abandoned by the defendant and the flow of surface water into the sewer was left unrestrained." There are several references to Stacey's Brook in the Hering report and plan. It is spoken of as a "water shed" which is "rapidly building up and in which sewage will constantly increase." To permit that to discharge into the little runs would cause it to become a worse channel than an open masonry sewer. It should, therefore, be "collected, intercepted and discharged at the proposed outfall." "Stacey's and Stony Brooks are too small to warrant their being kept free from polluting matter. Although the law prohibits the casting of refuse into them, experience in many other cities has shown its strict enforcement to be impracticable. *The street water also should be prevented from entering the brooks as much as possible, as it would tend to make them foul. I should therefore recommend their being converted into regular main sewers. The one for Stacey's Brook can, if rightly graded, completely drain and dry the bog meadow, and thus reclaim the entire area for building purposes, besides improving the healthfulness of the neighborhood.*" In discussing the sizes of the several sewers, it is said in the Hering report, "Where the rain water is admitted, heavy and sudden showers should be provided for. Among the latter class, I have computed, for instance, the size of the sewer above recommended to enclose Stacey's Brook . . . [here follows detailed description]. I have, however assumed that the Floating Bridge Pond will be drained into Flax Pond and Strawberry Brook." "Strawberry Brook, however, carries much more water, and with the intercepting sewers which are partly built or are now building and proposed, it can be kept in a reasonably pure condition without being enclosed." In another connection it is said, "The flushing facilities for the two intercepting sewers are exceptionally good. The Eastern can receive when required a large portion of the storm water from Stacey's Brook . . . . In addition however I would recommend the placing of two flushing gates . . . ."

There is a finding by the auditor that at " a short distance

from the intersection of Stacey's Brook main sewer with the Eastern Intercepting sewer there is an overflow, rectangular in shape, $2\frac{1}{2}$ feet high and 6 feet wide at about 3 feet above the bottom of the sewer." It does not appear that this overflow as to size, shape and precise position was a part of any plan adopted by the city council or recommended in the Hering report.

There was other testimony tending to show that the Hering plan and the orders of the city council concerning Stacey's Brook had been executed without material deviation. With its weight we are not concerned. That which already has been recited with the inferences reasonably to be drawn therefrom was enough to support a finding that the plan and orders did not warrant a permanent and unrestrained flow of all the surface water of Stacey's Brook, including the waters of Floating Bridge Pond, into the Eastern Intercepting sewer under the conditions here disclosed. It would serve no useful purpose to emphasize its salient features tending to that conclusion. The jury's finding cannot be pronounced without foundation in this respect.

The evidence was conflicting on the point whether the unrestrained permanent flow of Stacey's Brook into the Eastern Intercepting sewer had any effect in producing the flooding of the premises of the several plaintiffs, of which complaint here is made. The jury were at liberty to adopt the view which seemed to them reasonable.

There was a finding by the auditor in substance that at the crucial dates of damage to the plaintiffs " the sewers had not been cleaned for about four months " and that the side sewer in or near Market Street " was in part filled with sediment and other solid materials but I do not find that the presence of the debris contributed materially to the cause of the damages " to the plaintiffs. There was, however, other evidence from which it might have been found that these conditions contributed to those damages. With the weight of all the evidence on this point we have nothing to do. It was a matter which ought to have been submitted to the jury.

It follows that the defendant's motion for a verdict and

requests for rulings were denied rightly. The plaintiffs in open court waived their exceptions provided the defendant's exceptions were overruled.

> *Defendant's exceptions overruled.*
> *Plaintiffs' exceptions waived.*