WALTER J. CATTIN, APPELLEE, v. THE CITY OF OMAHA, NEBRASKA, APPELLANT.

31 N. W. 2d 300

Filed March 12, 1948.    No. 32335.

*Edward Fogarty, Edward Sklenicka, Einar Viren, James Paxson,* and *Herbert Fitle,* for appellant.

*Fitzgerald & Smith, Seymour L. Smith,* and *James W. R. Brown,* for appellee.

Heard before SIMMONS, C. J., PAINE, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ., and LIGHTNER, District Judge.

MESSMORE, J.

This is an action for damages from surface water flooding plaintiff's premises. Defendant moved for a directed verdict. The motion was overruled. The cause was submitted to a jury who returned a verdict for the plaintiff. Upon the overruling of motion for new trial, defendant appeals.

For convenience, the appellant will be referred to as the city and appellee as the plaintiff.

Due to considerable use of the words "Burt Street and Twenty-fifth Avenue," the same will be referred to as "Twenty-fifth and Burt."

The plaintiff predicates negligence on the part of

the city substantially on the following grounds. Located in the wall on the north side of Burt Street westward from the intersection of Twenty-fifth and Burt were three inlets constructed by the city in 1941. These inlets were about two feet high above the surface of the ground, ten feet long, and approximately 50 feet apart. In January 1944, these inlets were walled up by the city, and the city failed to provide other openings in lieu thereof for the escape of surface water at or near the said place into the sewer. The city, by stipulation, admits the construction of the inlets and the walling up of the same at the times heretofore mentioned.

The plaintiff charges the city with negligence without regard to the location of the plaintiff's property north-easterly from the intersection of Twenty-fifth and Burt, and at a lower level, because the city permitted surface water to accumulate at and near such intersection in greater volume than it would have accumulated naturally. The city defends on the ground that at the time in question there was an unusual, excessive, and unprecedented rainfall for such locality, and the damages plaintiff sustained, if any, were due to the same, over which the city had no control; that the closing of the inlets did not cause the flooding of plaintiff's premises.

The city predicates error on the trial court's failure to sustain its motion for directed verdict.

We deem it advisable at the outset, to set forth certain facts established by the record and exhibits appearing therein.

The drainage area tributary to Twenty-fifth and Burt consists of 1,100 acres. The history of the construction of the sewer system in this locality is as follows: In 1885, a five-foot-six-inch sewer was laid in Burt Street; in 1910, a seven-foot-eight-inch sewer was constructed in the same vicinity, both in operation in 1941. In 1941, a sewer nine feet in diameter was laid underground, extending along and below Burt Street opposite the inlets previously mentioned. This sewer does not drain

east of Twenty-fourth Street. These sewers were designed to carry a three-inch rain of uniform intensity at the rate of three inches per hour. There is a run-off of six-tenths of the water that runs into the sewer, the balance evaporates and is absorbed in various ways. The sewers are not constructed to carry water from a flash flood or an unusual, excessive, unprecedented rain.

The plaintiff owns a two-story frame building located at 2419 Cuming Street on the south side thereof facing north, where he has conducted a plumbing business for 26 years. All parts of the building, the lot, and equipment are described in the evidence. The lot extends south to the alley which runs from Twenty-fifth east to Twenty-fourth and is between Burt and Cuming Streets. In 1932, the plaintiff built a stone wall 25 feet south of the back of his building, three and one-half feet in height, to protect his property from floods or high water which occurred every spring up to the time of the construction of the sewer and inlets built in 1941. Thereafter, he reduced the stone wall to a foot in height, to permit better ingress and egress, and for the reason he expected no more floods on account of the sewer construction of 1941. None did occur until between midnight September 3 and 1 a. m., September 4, 1946.

The intersection of Twenty-fifth and Burt is a low point. The water running from Cuming Street slopes toward the south; Twenty-fourth Street and Burt is a high point, the water slopes down from that intersection; Burt Street is higher toward the west than it is at Twenty-fifth; and Creighton stadium is located on the south side of Burt Street, so water runs from all directions to the intersection of Twenty-fifth and Burt, creating a pocket. The elevation between Twenty-fifth and Burt and the alley heretofore mentioned is less than a foot. The elevations along the alley run from a high point, 83.35, and decrease until it measures 74.63, a low place near plaintiff's property.

The records of a federal meteorologist show that from

midnight, September 3, to 1 a. m., September 4, 1946, it rained 1.32 inches. From 12:20 to 12:30 a. m., .52 inches of rain fell. The rain is described as "heavy." Records of rains of greater intensity per hour were received in evidence, covering a period of time from June 16, 1928, through July 18, 1942, and also records of greater rain intensity within a five-minute period between July 6, 1898, to the date in question.

Shortly after 2 a. m., September 4, the plaintiff arrived at his premises. He first endeavored to extricate tenants from the second floor. He was not able to go to the back of the building on account of high water, about six feet deep, which was coming down the alley east from Twenty-fifth. There was no upsurging of the toilet in his building. On his lot there was a hole about six feet wide and seven feet deep, where the water ran through an opening, pushing the building up and undermining it, causing the same to become completely demolished. To replace it would cost $11,500. The chief engineer of the building department of the city recommended it be condemned.

The night of the flood the plaintiff noticed that the street-level inlets and grates in the vicinity of Twenty-fifth and Burt had collected rubbish of various sorts. There was no upsurging of water in the inlets in that vicinity. The morning of September 5, 1946, he returned to his premises and noticed rubbish had collected in the grates of the inlets. He did not notice whether any manhole covers were lifted or not. He testified in detail as to his losses.

A civil engineer, connected with the city for many years and on leave of absence, testified for the plaintiff. On September 6, 1946, he investigated the flood situation in the vicinity of Twenty-fifth and Burt; and described in detail the construction, number and location of street-level inlets in that vicinity, which we have noted. He defined a sewer under pressure as one running full of water, with more water trying to get into

it.   If there is enough pressure, water sprays through the holes in the manhole covers, or lifts them off completely.   He was asked, assuming the manhole covers at Twenty-fifth and Burt were intact as was the one in the alley back of the plaintiff's premises and the toilet in his building was not flooding or showing pressure upward on the night and morning in question, would such facts indicate the sewer at such location was not running full?   He answered, "Yes."   He gave as his opinion, if 1.32 inches of rain fell in an hour in the sewer system designed to carry a three-inch rain of uniform intensity over the watershed, that would indicate the sewers on Burt Street were not running full. He testified further that in establishing grades, curbs, paving or resurfacing, the city could determine the rate of grade and the direction the water should flow.   Paving and curbing of streets, and building sidewalks causes the water to run faster and have a smoother surface to run over than it would if it was natural dirt.   At the intersection of Twenty-fifth and Burt there is no natural surface drain, so if that sewer stops up for one reason or another, there is no way of taking care of it except to overflow private property.   The city knew that this intersection would not drain out, and also knew the alley back of plaintiff's place would not drain out.   No other construction was made to take the place of the inlets bricked up.   He further testified that the bricking up of the three inlets reduced very materially the facilities for receiving surface water in the pocket heretofore mentioned.   Several complaints had been made about this pocket.   The water backs up Twenty-fifth north to the alley and down the alley east to the plaintiff's property.   This sewer system was constructed to alleviate the flood condition at Twenty-fifth and Burt.

The city produced a number of witnesses who testified to the intensity of the storm, most of whom stated that it was the worst in intensity that they had seen. There was evidence of upsurging of water causing man-

hole covers to be lifted from their set places; causing paving to buckle and wash in various parts of the city; and causing toilets to overflow. A few of these incidents occurred in the vicinity of Twenty-fifth and Burt.

A witness living in the immediate vicinity of Twenty-fifth and Burt testified that the time in question is the first time since the construction of the sewers in 1941 that the water ran from curb to curb on Burt Street.

A bus driver for the street railway company, due to arrive at the bus barn on Twenty-fifth and Burt at 12:39 a. m., took a route directly north on Thirtieth to Burt and east on Burt to Twenty-fifth. At and prior to 12:35 a. m., it was raining so hard the windshield wipers would not clean the rain from the windshield. The water at Thirtieth and Cuming Streets was from curb to curb. Proceeding down Burt by Lincoln Boulevard his motor died. He took the bus out of gear and the water pushed him east on Burt to Twenty-fifth. He described the rainfall as the worst he had ever seen.

A mechanic's helper at the street railway company barn observed the rain at 11:30 p. m. About 12:17 a. m., he saw a car floating down Burt Street. The water was about three and a half feet high on the Creighton stadium wall at a point one block west of Twenty-fifth. After the water started to recede, it took 20 minutes before he could see the top of the street. He observed the manhole cover ten feet southeast of where it should have been, at Twenty-fifth. At 12:45 a. m., he noticed leaves, trash, and tin cans around the manhole. He had not seen a rain of like intensity in Omaha.

Another employee of the street railway company observed, about 11:30 p. m., it started raining. From 12:15 to 12:30 it rained in torrents and became pretty well flooded at 12:30. The water had accumulated in the intersection of Twenty-fifth and Burt to the extent that it was running over the retaining wall where the three bricked places, or inlets, are located. He noticed

two manhole covers that were dislodged south of the bus barn in the vicinity of Twenty-fifth and Burt that were 120 feet apart, and the one in between them was intact. The first was 100 feet west of the intersection of Twenty-fifth and Burt, and the other west of the first one.

The city sewer engineer who previously testified for the plaintiff, testified for the city and gave as his opinion that the sewer at Twenty-fifth and Burt was under pressure, assuming water was running down Lincoln Boulevard into Burt Street at a height of two and a half feet, and at a height of two feet down Burt Street west of the Boulevard, and assuming further, the water reached a height of six feet at Twenty-fifth and Burt. This was because the sewer inlets filled the sewers at the upper end of the drainage area and no more water could get in. He said the situation would not have changed in any way if the three inlets mentioned had been opened, because the sewer was already full and no more water could get into it. When these inlets were constructed he believed they would be of some value. They were closed without his knowledge. He recommended they remain closed. That due to the overflow in the alley, which is only a foot above the intersection, the inlets would not come into action until the water rose higher than a foot. If there were two feet of water in the street, one foot would go into the lower inlet, the other two inlets are a little higher.

He further testified, assuming that at the time of the high water it was three feet deep, 800 cubic feet of water per second flowing down the street would require an additional sewer of nine feet capacity to carry the water away. His explanation of why the flooding took place was that, during the rainfall, in twenty minutes everything was well saturated and the sewers were being filled from the upper end. As the rain progressed from the southwest toward the northeast, it took about 20 to 25 minutes for the storm water to reach from the upper

end of the drainage area to Twenty-fifth and Burt, and during the 20 minutes of hard rain the sewer filled up by virtue of an enormous shower, and the water had to go to the surface. Other facts will appear subsequently in the opinion as occasion requires.

The city, in support of its contention that the trial court should have directed a verdict for it, argues that the evidence discloses that the flood of the plaintiff's premises was caused solely by the intensity of the rainfall which amounted to a deluge, and not to the closing of the three inlets, citing Adams v. City of Omaha, 119 Neb. 753, 230 N. W. 680, and Wilson v. City of Omaha, 138 Neb. 13, 291 N. W. 732, which hold: " 'Cities of the metropolitan class are not liable for damages caused by surface water, because its storm sewers are of insufficient capacity to carry all of such water.' "

It is further said in the cited case, Adams v. City of Omaha, *supra*: "In an action against a city of the metropolitan class to recover damages caused by surface water flooding plaintiff's premises, no recovery can be had unless it is shown that some negligent act. or omission by the city caused the surface water to accumulate and be cast on plaintiff's premises."

The following authorities are likewise pertinent to this appeal.

"When a city makes provision by sewers or drains for carrying off the surface water, it may not discontinue or abandon the same, when it leaves the lot owner in a worse condition than he would have been if the city had not constructed such drains." McAdams v. City of McCook, 71 Neb. 789, 99 N. W. 656. This case recognized the rule that the city is under no obligation to construct a system of drainage for protection from the surface water, but having constructed a system of drainage, the city is not entirely absolved from liability for injury caused to the private property by its failure to keep the ditches in proper control after they have been constructed.

As stated in 4 McQuillin, Municipal Corporations (2d ed. rev.), § 1568, p. 432: "While as stated a grant of power to a municipal corporation to construct sewers and drains does not require it to do so, yet if it does exercise the power conferred, it is bound to use ordinary care or exercise due diligence to keep such sewers and drains as it constructs in proper condition and repair and free from obstructions, and will be held liable for damages to property resulting from its failure to do so."

In Randall v. City of Chadron, 112 Neb. 120, 198 N. W. 1020, this court held: "Where a city has constructed in its streets a system of gutters or drains to carry off surface water, it is charged with the duty of ordinary care to maintain them in a proper manner; and where one of its agents negligently and carelessly obstructs a gutter or drain in such a manner as to dam the flow and raise the water in the street to such a height that it overflows the curb and runs into the basement of plaintiffs' store, injuring a part of a stock of goods, the city itself will be liable for such injury." See, also, McAdams v. City of McCook, *supra;* 6 McQuillin, Municipal Corporations (2d ed. rev.), § 2869, p. 1227; Pevear v. City of Lynn, 249 Mass. 486, 144 N. E. 379.

In the last cited case it is said: "The law governing actions of this nature is settled. A municipality is not responsible for damages which accrue to individuals through any defect or inadequacy in the plan of its system of sewers, because that is established by public officers acting, not as its agents, but in a quasi judicial capacity for the benefit of the general public. A municipality is responsible for damages which accrue to individuals through negligence in the construction, maintenance or operation of its system of sewers, because that system when constructed becomes the property of the municipality, no one else can interfere with it and its care and continuance devolve wholly upon the municipality through such agents as it may select."

The city attacks instruction No. 5, given by the trial

court with reference to the legal duty of the city to exercise ordinary care and diligence in the operation and maintenance of the sewer system involved in this case. The city criticizes this instruction, claiming the court did not present the issue of negligence involved, that is, the closing of the openings, and as the instruction reads would permit the jury to go into matters of whether or not the city kept the ordinary inlets, other than the three involved in this case, open, and to which issue there was no pleadings in the petition and no competent proof in the record.

We have analyzed this instruction and find it to be in keeping with the authorities heretofore cited on this point. Under the pleadings, we find no prejudicial error in the giving of the instruction.

The city was charged with negligently maintaining the sewer system. The plaintiff did not rely on the inadequacy or insufficiency of the sewer system for a cause of action against the city. The evidence of the plaintiff goes to the negligence of the city in maintaining the sewer system in question.

We proceed with the city's assignment of error with reference to the question of an unusual, excessive, and unprecedented rainfall, owing to an act of God over which the city had no control. In addition to the cited cases of Adams v. City of Omaha, *supra,* and Wilson v. City of Omaha, *supra,* the city cites 6 McQuillin, Municipal Corporations (2d ed. rev.), § 2868, p. 1226, as follows: "Whatever the rule may be as to ordinary surface water or rainfalls, it is settled that a municipal corporation is not liable for damages caused by an overflow of its sewers occasioned by extraordinary rains or floods."

Geuder, Paeschke & Frey Co. v. City of Milwaukee, 147 Wis. 491, 133 N. W. 835, is cited to the effect that within the rule that a municipality is not liable for injuries from insufficiency of its sewage system to carry off the surface water in case of an extraordinary storm, the word "extraordinary" is not used as synonymous

with "unprecedented," but with "unusual," that which is rare or uncommon, happens sometimes, but not so often as to be regarded as a common occurrence. Also to the effect that within the rule that the limit of municipal responsibility to dispose of surface waters and sewage is to provide for such storms as are usually liable to occur, the term "usually liable" excludes storms which are liable to occur, and so are within reasonable anticipation that they may or will occur, but only at long intervals.

The city contends, under the foregoing cited authorities, in order for a municipality to establish a defense it is not necessary to prove a rain of such degree as to be considered an act of God, as was required by the court in its instruction in the instant case, but merely to show a rain which is rare or unusual, and does not occur so often as to become a common occurrence.

The evidence as to whether or not the rainfall at the time in question was unusual, excessive, or unprecedented, is in controversy. As set out in the statement of facts, rainfalls of greater intensity over the same period of time as the rainfall in the instant case appear in the record. Subsequent to the construction of the sewers in 1941, the record shows that on June 19, 1942, there was a rainfall of 2.44 inches in one hour, and on July 18, 1942, 1.40 inches in one hour. Fifty-seven hundredths of an inch of rain fell in ten minutes during each of the foregoing storms.

The engineer who constructed and designed the sewer system in question testified to overflows previously at Twenty-fifth and Burt; knew of previous heavy rains; and had made a study of the rainfall in Omaha in the city from 1873 to 1924. It is obvious the construction of the sewer system in 1941 was to alleviate this flood condition.

Where there is controversy in the evidence as to whether or not the rainfall was unusual, excessive, or unprecedented, the cases generally hold it is a question

for the jury. Siegfried v. South Bethlehem Borough, 27 Pa. Super. Ct. 456; Yeager v. City of Pittsburgh, 103 Pa. Super. Ct. 34, 157 A. 353; Woods v. City of Kansas, 58 Mo. App. 272, 280, citing Haney v. City of Kansas, 94 Mo. 334, 7 S. W. 417; City of Litchfield v. Southworth, 67 Ill. App. 398; City of Birmingham v. Jackson, 229 Ala. 133, 155 So. 527; Hession v. Wilmington, 1 Marvel's (Del.) 122, 40 A. 749; The Mayor, etc., of Savannah v. Cleary, 67 Ga. 153; District of Columbia v. Gray, 1 App. Cas. (D. C.) 500; and other cases too numerous to cite.

We have analyzed the instruction on this issue and find no prejudicial error contained therein.

The city predicates error on the court's submitting the second allegation of the plaintiff's petition, with reference to negligence on the city's part, to the jury. We have heretofore set forth in substance the plaintiff's allegation on this point. The contention is that the city is not liable for an increased flow of water upon the private premises of an individual which is due to the paving, curbing, installation of sidewalks, building of residences, or in other words, the natural growth of the city, citing 6 McQuillin, Municipal Corporations (2d ed. rev.), § 2882, p. 1269: "A fortiori, a municipality is not liable to a property owner for the increased flow of surface water over or onto his property, arising wholly from the changes in the character of the surface produced by the opening of streets, building of houses, and the like, in the ordinary and regular course of the expansion of the municipality." And, as stated in Fox v. City of New Rochelle, 240 N. Y. 109, 147 N. E. 544: "Nor is it liable for damage caused by the discharge of surface water which is the result solely of the grading of streets, the erection of buildings and the improvement of private grounds." Cases are cited.

In the case of Naysmith v. City of Auburn, 95 Neb. 582, 146 N. W. 971, this court held: "A municipal corporation has the right to improve and provide for the drainage of its streets; but if in so doing it causes an

increased flow of surface water upon or against private property, and negligently fails to provide a sufficient outlet for the escape of the water thus brought upon or against such property, it will be liable to the owner thereof for any damage that may result from such negligence." See, also, 43 C. J., Municipal Corporations, § 1905, p. 1145; Robbins v. Village of Willmar, 71 Minn. 403, 73 N. W. 1097; Sandy v. City of St. Joseph, 142 Mo. App. 330, 126 S. W. 989.

We make reference to the testimony of the civil engineer heretofore set out on this issue. We conclude the trial court did not err in submitting the plaintiff's second cause of action to the jury, necessarily, it ties in with the plaintiff's first cause of action.

We conclude from the evidence and the authorities heretofore set out and cited, the trial court did not err in overruling the city's motion for a directed verdict.

The city contends the court erred in instructing the jury as to the measure of damages. The evidence does not disclose the value of this property prior to the flooding thereof, or the value of the property when new. The plaintiff testified there was depreciation of the property from 35 to 40 percent. His expert witness testified that it would cost $11,500 to restore the property, and the use of old materials was not advisable and would cost too much.

The city offered the following instruction, which was rejected: "You are instructed that the uncontradicted evidence in this case establishes that plaintiff's building has been completely destroyed. In such case, in the event you find for the plaintiff, the measure of damages is the diminution in the value of the real estate at the time of and on account of such flood, plus interest at the legal rate of six per cent."

In support of this contention the city cites 25 C. J. S., Damages, § 85, p. 608, as follows: "The measure of damages for injury to, or destruction of, buildings or other structures is the amount of the loss, which may be

the difference in the value of the premises before and after the injury, the value of the building or structure, or, where practicable, the cost of restoration."

Davenport v. Intermountain R. L. & P. Co., 108 Neb. 387, 187 N. W. 905, is also cited, which held: "The measure of damages for the destruction of a building * * *, or the partial destruction thereof to such an extent that restoration would not be advisable, is, in cases where the building forms a part of the real estate and such real estate has a market value, the diminution in the value of such real estate at the time of and on account of such fire, plus interest at the legal rate."

The court instructed the jury on the measure of damages as follows: "The measure of plaintiff's damages to the building on his property is the reasonable cost of restoring same in the same condition it was in before the flood. In arriving at this cost of restoring such building, you shall consider the evidence relating to the cost new of a frame building of like kind and character to the existing building on the property prior to the flood, and the amount of depreciation that the latter had undergone just before such flood. From the reasonable cost new which you find, you will deduct the amount which corresponds with the depreciation which you find existed.

"Plaintiff, in the event you find that he is entitled to recover damages, is entitled to recover the cost of restoring the building to its original condition as nearly as may be determined, but not to that of a building in better condition."

"The cost of replacing the building, making a proper deduction for its age, utility, use, and condition, is a better measure of what the property was fairly and reasonably worth at the time it was destroyed." Kennedy v. Heat and Power Co., 103 Kan. 651, 175 P. 977.

In Graessle v. Carpenter, 70 Iowa 166, 30 N. W. 392, it is said: "* * * the plaintiff may recover as damage the sum which, expended for the purpose, would put

the property in as good condition as it was in before the injury, * * *."

"Where property, a part of the realty to which it is attached, is destroyed without damage to the realty itself, and where the nature of the thing destroyed is such that it is capable of being replaced at once, and the cost of doing so is capable of reasonable ascertainment, the measure of damages for its negligent destruction is the reasonable cost of replacing the property in like kind and quality." Koyen v. Citizens Nat. Bank, 107 Neb. 274, 185 N. W. 413. See, also, Missouri P. R. R. Co. v. Wood, 165 Ark. 240, 263 S. W. 964.

Davenport v. Intermountain R. L. & P. Co., *supra,* recognizes that a different rule than applied therein might be advisable in certain cases, that is, where the property might not have market value, or the building might not be a part of the real estate, or, in case of partial destruction, restoration of the building might be advisable.

We conclude, from a review of the authorities and applying the same to the evidence in this case, that the trial court did not err in giving the instruction on the measure of damages.

Other assignments of error are without merit.

For the reasons given in this opinion, the judgment of the trial court is affirmed.

AFFIRMED.