JULIUS YOUNG ET AL., APPELLANTS, V. CITY OF SCRIBNER, A MUNICIPAL CORPORATION, APPELLEE.

106 N. W. 2d 864

Filed December 30, 1960. No. 34849.

*Sidner, Lee, Gunderson & Svoboda,* for appellants.

*Spear, Lamme & Simmons,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, Julius Young and Ruby Young, as owners of a dwelling house property known as Lot 10, Block 39, in Scribner, a city of the second class, brought this action in equity against defendant city seeking to require it to remove certain obstructions theretofore placed by defendant in its drainage ditches in the city street to the south and east of plaintiffs' property; to enjoin defendant from thereby casting surface waters on plaintiffs' premises; and to recover damages to their property caused by such obstructions and inadequate drainage which flooded plaintiffs' property. The primary relief sought by plaintiffs, as the issues were joined by the parties, was to obtain mandatory injunctive relief requiring defendant to enlarge its inadequate culvert and drainage facilities in the intersection of State and Grant Streets west and south of plaintiffs' property in order to adequately drain the water therefrom west and south, or in the alternative to require defendant to remove certain obstructions placed by defendant in the north roadside ditch on Grant Street at a church driveway on Lot 11 east of plaintiffs' property in order to drain the water therefrom to the east.

In that connection, defendant's answer denied generally, then admitted its municipal status and plaintiffs' ownership of the property. However, defendant also denied that plaintiffs ever had any drainage to the east and alleged that plaintiffs' drainage had always been west and south and that defendant's culvert and facilities constructed by it in the intersection to the west and south were adequate.

The cause was tried and submitted to the trial court on April 9, 1959. Thereafter, on January 6, 1960, a judgment was rendered which found and adjudged the issues generally in favor of defendant and dismissed plaintiffs' petition, with costs taxed to plaintiffs. Subsequently, plaintiffs' motion for new trial was overruled and they appealed, assigning and arguing in substance that the trial court erred in dismissing plaintiffs' petition and in not requiring defendant to remove obstructions in at least one or the other of its roadside drains serving plaintiffs' property. We sustain plaintiffs' contentions, pointing out, however, that plaintiffs' evidence was insufficient to enable the trial court or this court to determine with any degree of accuracy the dollar amount of plaintiffs' damages. It is sufficient in that connection to say that plaintiffs did establish by competent evidence that they sustained continuing damages by flooding during 1957 and 1958. In that connection, it is elementary that in such a situation injunction is a proper remedy because equity looks to the nature of the continuing damages inflicted rather than to the magnitude thereof as a ground of affording relief.

Actions in equity, such as that at bar, are triable de novo by this court upon appeal, in conformity with the rule of this court, reaffirmed as recently as Peters v. Woodmen Accident & Life Co., 170 Neb. 861, 104 N. W. 2d 490.

As far as important here, section 17-508, R. R. S. 1943, gives second-class cities the power to provide for the

grading and repair of streets and the construction of culverts and sewers.

In Cattin v. City of Omaha, 149 Neb. 434, 31 N. W. 2d 300, this court said: "The following authorities are likewise pertinent to this appeal.

" 'When a city makes provision by sewers or drains for carrying off the surface water, it may not discontinue or abandon the same, when it leaves the lot owner in a worse condition than he would have been if the city had not constructed such drains.' McAdams v. City of McCook, 71 Neb. 789, 99 N. W. 656. This case recognized the rule that the city is under no obligation to construct a system of drainage for protection from the surface water, but having constructed a system of drainage, the city is not entirely absolved from liability for injury caused to the private property by its failure to keep the ditches in proper control after they have been constructed.

"As stated in 4 McQuillin, Municipal Corporations (2d ed. rev.), § 1568, p. 432: 'While as stated a grant of power to a municipal corporation to construct sewers and drains does not require it to do so,. yet if it does exercise the power conferred, it is bound to use ordinary care or exercise due diligence to keep such sewers and drains as it constructs in proper condition and repair and free from obstructions, and will be held liable for damages to property resulting from its failure to do so.'

"In Randall v. City of Chadron, 112 Neb. 120, 198 N. W. 1020, this court held: 'Where a city has constructed in its streets a system of gutters or drains to carry off surface water, it is charged with the duty of ordinary care to maintain them in a proper manner; and where one of its agents negligently and carelessly obstructs a gutter or drain in such a manner as to dam the flow and raise the water in the street to such a height that it overflows the curb and runs into the basement of plaintiffs' store, injuring a part of a stock of goods, the

city itself will be liable for such injury.' See, also, Mc-Adams v. City of McCook, supra; 6 McQuillin, Municipal Corporations (2d ed. rev.), § 2869, p. 1227; Pevear v. City of Lynn, 249 Mass. 486, 144 N. E. 379.

"In the last cited case it is said: 'The law governing actions of this nature is settled. A municipality is not responsible for damages which accrue to individuals through any defect or inadequacy in the plan of its system of sewers, because that is established by public officers acting, not as its agents, but in a quasi judicial capacity for the benefit of the general public. A municipality is responsible for damages which accrue to individuals through negligence in the construction, maintenance or operation of its system of sewers, because that system when constructed becomes the property of the municipality, no one else can interfere with it and its care and continuance devolve wholly upon the municipality through such agents as it may select." See, also, 38 Am. Jur., Municipal Corporations, § 629, p. 330, § 636, p. 340, § 639, p. 344, § 645, p. 351.

In Naysmith v. City of Auburn, 95 Neb. 582, 146 N. W. 971, this court said: "We take it that it is a well-settled principle of law that neither the owner of land nor a municipal corporation has any right to collect waters and discharge them upon the lands of another in a greater quantity than what would have reached the property by natural drainage. Elliott v. Oil City, 129 Pa. St. 570; Byrnes v. City of Cohoes, 67 N. Y. 204; 30 Am. & Eng. Ency. Law (2d ed.) 339; Lincoln & B. H. R. Co. v. Sutherland, 44 Neb. 526. In 10 Am. & Eng. Ency. Law (2d ed.) 243, it is said: 'It is well settled according to all the authorities that, were (sic) the effect of the sewer, whatever its plan, is to cause a direct invasion of private property by collecting and throwing upon it in new channels or in increased quantities water that would not otherwise have found its way there, the corporation is liable.' We can conceive

no reason why the same rule should not be applied to surface drainage or surface sewers."

In City of Kearney v. Themanson, 48 Neb. 74, 66 N. W. 996, involving facts comparable in some material respects with those at bar, this court said: "The mere right of a proprietor to defend himself against surface water without being responsible for the consequences has never been denied by this court. But there may be a difference between the possession of a right and the manner of its exercise. In the case at bar it may be conceded that the city had a right to grade the street in question,—to build the embankment therein. This right we do not call in question. It is only the manner of the exercise of that right that is involved in this litigation."

Also, in Goodrich v. University Place, 80 Neb. 774, 115 N. W. 538, this court held: "By accepting the special privileges and powers of taxation, supervision and local government, cities of the second class and villages assume the duties, responsibilities and liabilities flowing therefrom and incident thereto in the same manner and to the same extent as any other municipality; and such special privileges and powers constitute a sufficient consideration for the obligations and liabilities thus assumed."

As stated in 63 C. J. S., Municipal Corporations, § 770, p. 69, citing numerous authorities: "Like an individual, a municipality may, in a proper case, be enjoined from creating or maintaining a nuisance, or be required to abate one already created by it." See, also, 63 C. J. S., Municipal Corporations, § 879, p. 265, § 880, p. 268, § 893, p. 294; 38 Am. Jur., Municipal Corporations, § 643, p. 348.

In the light of such authorities, we have examined the record. It discloses that some of the evidence is undisputed and that some of it is conflicting; but we bear in mind that some material conflicting testimony given by the city officials and agents in defendant's behalf

was either equivocal or incredible when considered in the light of two undisputed surveys made by the county surveyor, and photographs reflecting the flooded condition of plaintiffs' property in 1958, which were offered and received in evidence.

Plaintiffs purchased the property in 1944 and moved into it in 1945 when their son, who was a tenant thereon, had moved out. It is undisputed that from 1944 to 1957 plaintiffs' property had never been flooded. The property is 256.2 feet long, running east and west, and is 85 feet wide, running north and south. It is bordered on the west by State Street and on the south by Grant Street, which streets intersect at the southwest corner of plaintiffs' property. The two surveys made by the county surveyor show the topography and pertinent elevations of plaintiffs' property and of State and Grant Streets bordering plaintiffs' property up to and beyond the intersection thereof, and show an admittedly inadequate 18-inch culvert therein which had been installed by defendant to drain water to the south beyond the intersection. In that connection, said culvert was one-tenth of a foot higher at the south end than it was at the north end. One such survey was made at request of plaintiffs, wherein the elevations were taken at the flow line of a ditch running south on the east side of State Street, and the other was made at request of defendant wherein comparable elevations were taken at the flow line of defendants' culvert at the intersection.

By such survey and other evidence it was established that from a point about one and one-half blocks north of plaintiffs' property, State Street slopes south down to and along the west end of plaintiffs' property, thence south across the intersection and on south beyond it. A ditch on the east side of State Street drains the water south into the culvert in the intersection, thence on to the south. The southwest corner of plaintiffs' property, which is the northeast corner of the intersection, is

lower than either end of the city's culvert, and is lower than the west side of the intersection and the northwest corner of Grant Street therein.

From 1943 to 1956, there was a ditch in the street on the north side of Grant Street which extended from the southwest corner of plaintiffs' property, thence east along the south side of plaintiffs' property, thence east along and beyond adjacent Lot 11 where a Catholic church was constructed upon higher ground about 1956. One witness who lived on plaintiffs' property in 1943 and 1944, one witness who lived on said property in 1944 and 1945, plaintiff Julius Young who lived thereon from 1945 to date, and his daughter, a nurse, who lived there with plaintiffs from 1952 to date, testified that there was such a ditch. Before construction of the church, there was a slight rise about midway in plaintiffs' land where they had a garage and a driveway leading thereto from Grant Street. There is evidence that to the east of plaintiffs' driveway the water then drained east, and to the west thereof it drained west and south. Some witnesses for defendant testified contrary thereto, but subsequent events and other evidence, together with pertinent elevations of the ditch and adjacent property, reasonably indicate otherwise.

In that connection, the surveys demonstrate, and the evidence discloses, that the church was constructed on Lot 11 about 1956, and that about midway thereof there is a rise on the north side of Grant Street where the roadside ditch had been filled without any culvert, and had been subesquently graveled over by the city for a driveway to the church. Some 4 feet under said driveway, in order to protect the water from freezing, the city had theretofore constructed and buried its extended sewer and water pipes needed for the church. How deep the ditch was before filling without any culvert thereunder is not definitely shown, but, in any event, it appears from the surveys and evidence that there is a roadside ditch which distinctly slopes to the

west from such church driveway and along the east end of plaintiffs' property to the rise in plaintiffs' driveway and beyond to the intersection, and that there is a roadside ditch which distinctly slopes from such church driveway to the east along the east end of its property, thence east along adjoining Lot 12 to a point where the drainage is south. Also, about the same time, the city placed asphalt on Grant Street to a point beyond the church. property, which increased the flow of water to the west and south. As a result, surface water flowed down the north ditch in Grant Street from the church property and driveway and over the east end of plaintiffs' property. It also flowed over asphalted Grant Street and down the ditch on the east side of State Street to the inadequate culvert in the intersection, where accumulations of water backed up and flooded plaintiffs' property.

Upon complaint thereof to city officials by plaintiff Julius Young in 1957, the city admittedly put a culvert in the north ditch under plaintiffs' garage driveway and constructed a dike on the north side of the ditch in Grant Street along the south side of plaintiffs' property. The city refused to place an enlarged culvert in the intersection to drain such waters south unless plaintiffs would furnish the culvert and because in any event there would be too much opposition thereto by residents living south thereof who had driveway drains that might be too small to carry the water. The city also refused to remove the obstruction at the church driveway or put a culvert thereunder so the water would drain east from plaintiffs' driveway, because of danger to the city's water and sewer connections to the church. As a result of the foregoing situation, water came down over and inside the dike, admitted to have been wrongfully constructed by the city, and accumulated on the east end of plaintiffs' land, which water, together with water accumulated in the intersection, flooded plaintiffs' property and seriously damaged or

destroyed plaintiffs' garden, strawberry and raspberry crops, and other property. As a matter of fact, plaintiffs' property was so flooded three different times in 1957 and twice in 1958. The extent and manner thereof in 1958 is demonstrated by photographs offered and received in evidence.

In that situation, plaintiffs brought this action contending that defendant should be required to remove the obstructions placed by the city in the north roadside ditch east of plaintiffs' property and thus carry drainage to the east, which would admittedly be more expensive, or in the alternative to provide an adequate culvert and facilities in the intersection for city drainage to be carried away to the west and south of plaintiffs' property.

On the other hand, defendant contends that there never was any ditch which carried drainage from plaintiffs' property to the east, although defendant admits that it had installed water and sewer connections for the church under the filled-up ditch without a culvert, and had leveled same with gravel for the church driveway from Grant Street, as heretofore mentioned; that it put a culvert under plaintiffs' driveway and wrongfully constructed the dike in and along Grant Street north of the ditch along the south side of plaintiffs' property; and it is undisputed that defendant's culvert in the intersection of State and Grant Streets was inadequate to carry the drainage south. As a matter of fact, defendant's officers and agents who testified, claimed that but little if any water had ever flooded plaintiffs' land when they viewed it, which is refuted by direct evidence and the photographs received in evidence; that in any event defendant's facilities were adequate and the flood of plaintiffs' land came from and was caused solely by heavy rains more than would be normally anticipated, which the record does not sustain; and that plaintiffs were not entitled to relief because some other people in Scribner had similar trouble, which is not a legitimate defense. Defendant also argued that, under the

circumstances, defendant was not liable as a matter of law. We do not agree.

In that connection, authorities relied upon by defendant are entirely distinguishable upon the facts. To discuss them at length herein would serve no useful purpose. Suffice it to say that this is not a case wherein plaintiffs simply sought to require defendant to provide surface water drainage for their property in a situation where such drainage had been obstructed by third parties. Rather, it is a case wherein defendant's officials and agents, by their own wrongful and negligent acts of omission and commission, caused the obstructions and flooding and thereby created a nuisance upon plaintiffs' property.

We decide, upon trial de novo, that plaintiffs were entitled to the mandatory injunctive relief sought by them. Therefore, we conclude that the judgment of the trial court should be and hereby is reversed and the cause is remanded with directions to render a judgment finding and adjudging the issues in favor of plaintiffs and against defendant, and granting plaintiffs the mandatory injunctive relief sought by plaintiffs. All costs are taxed to defendant.

REVERSED AND REMANDED WITH DIRECTIONS.